UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRIYA NARANG,

                              Plaintiff,

                  -v-

TROY ARMOUR, *et al.*,

                              Defendants.

24-CV-1125 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Priya Narang brings this action for breach of contract and quantum meruit against Defendant Troy Armour and several corporate entities based in Northern Ireland. Before the Court is Defendants' motion to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. For the reasons that follow, that motion is granted in part and denied in part.

I.      **Background**

The following facts are drawn from the operative complaint (Narang's "Supplemental Amended Complaint") and presumed true for the purposes of resolving the present motion. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

        A.      **Junk Kouture Retains Narang's Marketing Firm**

Narang is a "marketing and branding professional" based in New York, who until recently was a partner at the commercial marketing firm Leverage Marketing Advisors ("LMA"). (ECF No. 49 ("SAC") ¶ 3.) Junk Kouture "is a Northern Ireland entertainment, media, and tech company" that is "best known for hosting a regional, in-school creative program and fashion competition that challenges students aged 13-18 to create wearable fashion made from 100% recycled materials." (*Id.* ¶ 2.) Junk Kouture comprises several formally distinct

corporate entities: Junk Kouture Operations Ireland LTD ("JK Operations"), Junk Kouture

Entertainment and Media Group Limited LLC ("JK Entertainment"), Junk Kouture Limited ("JK

Limited"), and Junk Kouture Production Limited ("JK Production").  (*Id.* at 1.)  Narang alleges

that all of the Junk Kouture entities are alter egos of Armour, who comingles the entities' assets

with his own.  (*See id.* ¶ 41.)

　　　The relationship between LMA and Junk Kouture began when the latter retained LMA

"to identify and sell sponsorships" on its behalf.  (*Id.* ¶ 8.)  To that end, in April 2021, "LMA

entered into a six-month agreement with JK to devise marketing strategies and sponsorship

proposals targeting prospective partners in New York, London, Paris, Milan and the UAE," for

which LMA would be paid a $20,000 monthly retainer and a twenty-percent commission on

sponsorships sold.  (*Id.* ¶ 9.)  Narang was personally entitled to $4,500 of the monthly retainer,

and alleges that she is still owed $18,000 for four months of unpaid fees (*id.* ¶¶ 10-11), though

she does not assert claims for breach of that six-month agreement (*see id.* ¶¶ 48-49).  LMA did

not secure any sponsorships during that period, but toward the end of it, "Narang was close to

securing sponsorship from the U.S. accounting firm Deloitte by leveraging pre-existing personal

relationships with Deloitte's senior personnel."  (*Id.* ¶ 12.)  Deloitte conducts significant

operations in New York City.  (*See id.* ¶ 13.)[1]

　　　In November 2021, the agreement between LMA and Junk Kouture was renewed "under

revised terms" that eliminated the monthly retainer and lowered LMA's commission from twenty

to fifteen percent of sponsorship sales.  (*Id.* ¶ 15.)  However, the agreement preserved the

---

[1] Narang's allegation that Deloitte is "located in New York City" is part factual allegation
and part legal conclusion.  The legal conclusion is, of course, not entitled to any presumption of
truth.  *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 321 (2d Cir. 2010).  But for present
purposes, it is sufficient to infer from the operative complaint that Deloitte conducts significant
operations in New York City, regardless of where it is legally domiciled.

twenty-percent commission for a sponsorship deal with Deloitte, and provided that the entirety of that commission would be paid to Narang.  (*Id.*)

Nearly a year later, in September 2022, Narang, Junk Kouture, and Deloitte entered into a $500,000 sponsorship agreement, entitling Narang to a $100,000 commission, "less $50,000 of previously paid draws against commission that had been or was to be paid to LMA."  (*Id.* ¶ 16.) Deloitte paid Junk Kouture the $500,000 in October 2022, but Junk Kouture did not immediately pay Narang $50,000, citing a "lack of funds."  (*Id.* ¶¶ 17-18.)  In February 2023, Junk Kouture offered Narang "new contractual terms" that provided for Narang to be paid $10,000 in five bimonthly payments—the first four of which she received from Junk Kouture, and the final of which was "fronted" by her colleague as a loan to Armour.  (*Id.* ¶ 19.)

**B.    Narang and Junk Kouture Execute a Memorandum of Understanding**

Thereafter, the LMA partnership permitted Narang to enter into an individual commission agreement with Junk Kouture.  (*Id.* ¶ 20.)  She also arranged another sponsorship deal with Deloitte for a $500,000 payment to Junk Kouture in 2023 and a right for Deloitte to extend the sponsorship "for another two years at the same or greater commitment."  (*Id.* ¶ 21.) "To secure her commission," Narang and Junk Kouture entered into a Memorandum of Understanding ("MOU"), "drafted and signed by Troy Armour on behalf of JK Operations on or about March 26, 2023."  (*Id.* ¶ 22.)  Narang signed the agreement in New York City and sent it to Armour and another Junk Kouture employee on the same day.[2]  (*Id.* ¶ 23.)

The MOU purports to run from May 1, 2023 to April 30, 2026, and provides for a fifteen-percent commission for Narang on sponsorships secured for Junk Kouture, payable even after the

---

[2] Narang's allegation that she signed the MOU "on March 26, 2026" (SAC ¶ 23) appears to be a typographical error, rather than a suggestion of time travel.  Fortunately for the prevailing laws of physics, the MOU's execution date is presently irrelevant.

expiration of the agreement.  (*Id.* ¶¶ 24-25.)  The agreement provides explicitly that "Narang is responsible for securing a renewal of the existing agreement between [Junk Kouture] and Deloitte."  (*Id.* ¶ 26.)

Around the same time, in April 2023, Narang arranged a meeting between Junk Kouture and executives at Mastercard "regarding a potential sponsorship."  (*Id.* ¶ 27.)  According to Narang, Armour refused Narang's request for a sponsorship agreement relating to Mastercard, explaining that Junk Kouture had limited funds and that he feared it would "look bad" to take sponsorship funds and then promptly shut down.  (*See id.* ¶ 27 (brackets omitted).)  Narang then postponed the meeting between Junk Kouture and Mastercard, which "incensed Armour" into ending Junk Kouture's relationship with Narang.  (*Id.* ¶¶ 28-29.)  But earlier, on January 24, 2023, Armour had reached out to Narang to confirm that Junk Kouture "would like to work with [Narang] on Deloitte going forward," and that Junk Kouture would "of course honor the Deloitte commission agreement."  (*Id.* ¶ 30.)

As a result of Narang's efforts, Deloitte paid Junk Kouture a $500,000 sponsorship fee around October 2023, generating a $75,000 commission for Narang.  (*Id.* ¶¶ 31, 33.)  The month before, Narang, concerned that Junk Kouture would not honor the MOU, emailed asking that the commission be paid to her directly, via wire transfer, or by Deloitte itself.  (*Id.* ¶ 33.)  Armour responded, characterizing Narang's request as a "*claim* for payment" and offering Narang a "goodwill payment of $10,000 in full and final settlement to bring all matters to a close."  (*Id.* ¶ 34.)  A few days later, Armour accused Narang of misrepresentation, claiming that Narang had told Junk Kouture that the Deloitte deal would be worth $10 million, and proposed a $10,000 commission, rather than $75,000.  (*Id.* ¶ 35.)  That concerned Narang, in part because she considered "one year's commission plus the balance owed under the MOU if Deloitte continued

its sponsorship [to value] at least $225,000." (*Id.* ¶ 36.)  She sent Armour and Junk Kouture "an invoice for her $75,000 commission." (*Id.* ¶ 37.)

### C.    Narang Commences this Action

Narang commenced this action on February 15, 2024, asserting claims for breach of contract and quantum meruit against Armour and the Junk Kouture entity defendants.  (ECF No. 1.)  After some back-and-forth concerning whether the original complaint alleged a basis for the Court's subject matter jurisdiction (*see* ECF Nos. 3, 9, 10, 11), Narang filed an amended complaint (ECF No. 12 ("AC")).  Defendants then filed, and the parties fully briefed, a motion to dismiss the amended complaint.  (ECF Nos. 16, 18, 24, 29.)

### D.    Deloitte Pays a Second $500,000 Sponsorship Fee

On December 6, 2024, Narang filed a motion (ECF No. 39) to supplement her amended complaint pursuant to Federal Rule of Civil Procedure 15(d), under which a district court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  In a supporting memorandum, Narang represented that Deloitte had, since the commencement of the litigation, paid another $500,000 sponsorship fee to Junk Kouture, entitling Narang to an additional commission that she sought to include in her computation of damages.  (ECF No. 42 at 4.)  Despite Defendants' opposition (ECF No. 47), the Court granted Narang's request (ECF No. 48).  The Court also denied Defendants' original motion to dismiss the amended complaint without prejudice in light of the new operative complaint.  (ECF No. 56.)

True to her Rule 15(d) motion, Narang alleges in the now-operative pleading that, since this action commenced, Deloitte paid another $500,000 sponsorship fee to Junk Kouture on or about November 1, 2024.  (SAC ¶ 38; *see also* ECF No. 42 at 4.)  Defendants have since rejected Narang's request for commission on that sponsorship payment, instead "redirect[ing] the funds

due Narang per the MOU to either Armour for his personal use or to third parties with the intent to deprive her of [the] same." (SAC ¶¶ 39-40, 46.) Narang alleges, also, that "Armour commingles his personal funds and those of the many corporate Defendants, fails to maintain adequate books and records, and is the alter ego of the corporate JK defendants." (*Id.* ¶ 41.)

### E. Defendants Move to Dismiss the Operative Complaint

Defendants moved to dismiss the operative complaint on February 24, 2025 (ECF No. 59) and filed a memorandum of law in support (ECF No. 60 ("Mem.")). Narang opposed the motion on March 10, 2025. (ECF No. 61 ("Opp.").) Defendants replied in further support of their motion on March 31, 2025. (ECF No. 66 ("Reply").)[3]

## II. Legal Standards

### A. Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

Rule 12(b)(1) of the Federal Rules of Civil Procedure requires dismissal of a claim for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The burden is on the plaintiff to allege facts establishing proper subject matter jurisdiction. *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003). "In a motion to dismiss [for lack of subject matter jurisdiction] pursuant to Fed. R. Civ. P. 12(b)(1), the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001). And though the Court must take the plaintiff's factual allegations to be true, jurisdiction may not be established "by drawing from the pleadings

---

[3] The Court originally granted a motion to stay discovery on January 8, 2025. (ECF No. 48). The Court lifted the stay at a telephonic conference held on February 12, 2025. (Minute Entry, February 12, 2025.)

inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

### B.    Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). Where, as here, there has been no "full-blown evidentiary hearing on the motion, the plaintiff need make only a *prima facie* showing of jurisdiction." *Id.* (quoting *Bank Brussels*, 171 F.3d at 784). At this "preliminary stage," a *prima facie* showing sufficient to defeat a Rule 12(b)(2) motion "may be established solely by allegations" pleaded in good faith. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). The allegations, though, must be more than "conclusory statement[s]"; rather, they must state specific "facts supporting [the] conclusion" that jurisdiction is proper. *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998).

### C.    Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must include enough facts to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true but need not accept as true "mere conclusory statements" reciting the elements of a cause of action. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555. A complaint that pleads facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and

plausibility." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

## III.    Discussion

Defendants move to dismiss the complaint, arguing that (1) the Court lacks subject matter jurisdiction; (2) the Court lacks personal jurisdiction; (3) New York's "election of remedies" doctrine precludes Narang's recovery for alleged breaches following the initiation of this litigation; (4) all defendants other than JK Operations (the "nonsignatory defendants") may not be bound by the MOU because they did not sign it; and (5) the quantum meruit claim is duplicative of the breach of contract claim and thus barred.  The Court addresses each in turn.

### A.    Subject Matter Jurisdiction

Federal courts possess "limited jurisdiction," constrained both by Article III of the Constitution as well as, in the case of lower federal courts, by statute.  *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025).  In particular, federal district courts may exercise subject matter jurisdiction over "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of a State and citizens or subjects of a foreign state."  28 U.S.C. § 1332(a)(2).  A plaintiff may aggregate their claims against a single defendant—or, as here, against multiple defendants jointly—to satisfy the jurisdictional amount.  *See Snyder v. Harris*, 394 U.S. 332, 335 (1969); *Walter v. Northeastern R. Co.*, 147 U.S. 370, 373 (1893).  "Diversity of citizenship is not disputed here; the jurisdictional dispute relates only to the amount in controversy."  *Cf. Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767, 769 (2d Cir. 2006).

"A party invoking the jurisdiction of the federal court has the burden of proving that it appears to [be] a reasonable probability that the claim is in excess of the statutory jurisdictional amount."  *Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003)

(quotation marks omitted).  The burden of establishing that the jurisdictional amount is "hardly

onerous" as there is "a rebuttable presumption that the face of the complaint is a good faith

representation of the actual amount in controversy." *Id.* at 397 (quoting *Wolde-Meskel v.

Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999)).  Overcoming

that presumption requires that there be "a legal certainty that the claim is really for less than the

jurisdictional amount to justify dismissal."  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303

U.S. 283, 289 (1938).

    The parties' disagreement regarding the amount-in-controversy requirement centers on

the legal sufficiency of the supplemental allegations in the operative complaint.  The Court will

turn to that in due course, but first, it must address a threshold issue: whether those supplemental

allegations are even relevant to determining whether Narang has satisfied the requirements of

Section 1332.  *Cf. United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (holding that a court

must assure itself of its subject matter jurisdiction regardless of arguments made by the parties).

    That is because, in the ordinary case, the amount-in-controversy requirement must be

satisfied at the time the litigation was filed, regardless of subsequent amendments or events.  *See

Royal Canin*, 604 U.S. at 38 n.8 ("[T]his Court has viewed [the amount-in-controversy

requirement] as analogous to the time-of-filing rule applying to citizenship, which also assesses a

factual issue relevant to jurisdiction only at the suit's outset."); *see also* 14B Charles Alan

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3706 (5th ed.) ("[T]he existence

or nonexistence of the amount in controversy required for subject matter jurisdiction is

determined on the basis of the facts and circumstances as of the time that an action is

commenced in a federal court." (collecting cases, including *Hall v. EarthLink Network, Inc.*, 396

F.3d 500 (2d Cir. 2005))).  That said, there is a "significant caveat to the general

rule . . . recognized by many federal courts," that if "the original pleading failed to state an amount in controversy or stated an amount in a confusing or ambiguous or uncertain manner, or the plaintiff has provided a binding stipulation not to seek an award in excess of the jurisdictional amount, the district court may interpret later events as attempts at 'clarification' of the facts existing at commencement . . . of the action."  Wright & Miller, *supra*, § 3706 (collecting cases).

On that score, Narang's supplemental allegations about an additional $75,000 payment that accrued after the filing of this litigation might seem irrelevant to her satisfaction of the amount-in-controversy requirement.  But crucially, Narang alleges that her right to all of the Deloitte commissions flows not from new agreements, but from the MOU, which was executed before the commencement of this litigation and formed the basis for the first complaint Narang filed.  (*See* ECF No. 1.)  In other words, the supplemental allegations do not change the scope of the legal right Narang sought to vindicate when she commenced this suit.  The relevant subsequent event—Deloitte's payment of another commission fee in 2024—did not expand or shrink that right, further evidenced by the operative complaint's omission of any new cause of action.  Since Narang alleged in the original complaint that "one year's commission plus the balance owed under the MOU if Deloitte continued its sponsorship had a total value of at least $225,000" (ECF No. 1 ¶ 33 (typographical error omitted)), that her computation of damages would potentially increase upon such a renewal simply clarified the amount that has always been in controversy.  Accordingly, the Court may credit both $75,000 payments allegedly owed to Narang (and, indeed, the entire $225,000 she alleges she may be owed under the MOU) to determine whether Section 1332's jurisdictional minimum has been satisfied.  It is far from legally certain that the original complaint would have capped Narang's damages under the MOU at $75,000, especially in light of the "hardly onerous" burden she carries to establish jurisdiction.

Assured that the time-of-filing rule poses no obstacle in this case, the Court can turn now to Defendants' argument that the operative complaint validly places only $75,000 (the 2023 commission) in controversy because recovery of the 2024 commission is barred by New York's election of remedies doctrine. (*See* Mem. at 17.) "Under New York law, election of remedies is an affirmative defense." *MBA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012). "[A]ffirmative 'defenses asserted on the merits' may not be used to whittle down the amount in controversy." *Scherer*, 347 F.3d at 397 (quoting *Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982)). That rule does not "depend on whether a colorable argument against the defense has been advanced," regardless of whether the absence of such an argument appears to create a legal certainty that the plaintiff's recoverable damages are below the jurisdictional requirement. *Id.* at 397-98. Indeed, that rule comports with the time-of-filing rule that was discussed earlier, for if the Court is to assess the amount in controversy at the time the litigation commences, it would be impossible to know with any certainty whether a defendant would assert—much less prevail on—an affirmative defense. *See id.* at 398 ("Given the time-of-filing rule, it follows that [waivable] "affirmative defenses" are not germane to determining whether the amount-in-controversy requirement has been met."). But though the time-of-filing rule does not impede Narang's arguments for jurisdiction because of the doctrine permitting retroactive clarification of the amount in controversy, it does impede Defendants' arguments about the election of remedies defense, which no doctrine makes retroactive to the time the suit was filed.

In sum, on February 15, 2024, when this action was commenced, two things were true: Narang sought to recover on a contract she considered to be worth potentially $225,000, and

Defendants had not yet uttered a word about the defense of election of remedies. Thus, the jurisdictional amount-in-controversy requirement was satisfied then, and remains so now.

### B.    Personal Jurisdiction

Assured it may entertain an action concerning the subject matter of this case, the Court turns next to whether it may exercise personal jurisdiction over Defendants. Defendants are subject to a district court's personal jurisdiction if they are "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," Fed. R. Civ. P. 4(k)(1)(A), so far as that exercise comports with due process, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (citing *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) (hereinafter "*Licci II*"); *see also Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 102-05 (2d Cir. 2023) (holding that the Fourteenth and Fifth Amendments impose identical constraints on a state and federal court's exercise of personal jurisdiction, respectively). Within those limits, personal jurisdiction comes in two varieties: "specific (or 'case-linked') and general (or 'all-purpose')." *Keep on Kicking Music, Inc. v. Universal Music Publ'g Grp.*, No. 23-CV-4400, 2024 WL 3675936, at *2 (S.D.N.Y. Aug. 5, 2024) (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021)).

Because the exercise of general personal jurisdiction is broader than that of specific personal jurisdiction, the Constitution imposes stricter limits on the former. To be subject to suit on any cause in a particular forum state, a defendant's "affiliations with the State [must be] so continuous and systematic as to render it essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 119 (2014) (cleaned up). Individual defendants are "at home" in the state in which they are domiciled—that is, the state in which they reside and intend to remain indefinitely. *Ford Motor Co.*, 592 U.S. at 358-59; *see also Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (setting out the "generally uncontroverted" definition of domicile). "And the

'equivalent' forums for a corporation are its place of incorporation and principal place of business." *Ford Motor Co.*, 592 U.S. at 359 (quoting *Daimler*, 571 U.S. at 137).  No one here contends that any defendant is domiciled in New York, either as an individual or as a corporation by virtue of being incorporated or having a principal place of business here.  (*See* Opp. at 13-16 (arguing exclusively that the Court's exercise of specific personal jurisdiction is proper).)  The Court therefore may not exercise general personal jurisdiction over any defendant.

That leaves specific personal jurisdiction, as authorized by both New York law and the Due Process Clause.  As to the former, in relevant part, New York permits its courts to "exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state," so long as the cause of action arises from such acts.  N.Y. C.P.L.R. § 302(a); *see also Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) ("To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity.").  "Section 302 is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 276 (2d Cir. 2024) (quotation marks omitted).  Still, to establish a transaction of business, a defendant's activities must constitute the defendant's "purposefully avail[ing] itself of the privilege of conducting activities within New York."  *Id.* at 277 (quoting *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 377 (2014)).  For example, in *American Girl*, the Second Circuit held that shipping orders made on the Internet to a New York address and

13

accepting payment therefor "constitutes transacting business within New York for purposes of jurisdiction under § 302(a)(1)." *Id.*

"If the long-arm statute permits personal jurisdiction, the second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). Though Section 302(a)'s and the Due Process Clause's requirements for contact with the forum state are doctrinally distinct, courts often analyze them together, as transacting business in or supplying goods and services to New York is often—though not always—sufficient to constitute minimum contacts, as well. *See, e.g.*, *id.* at 171 ("We conclude that assertion of personal jurisdiction over Ubaldelli comports with due process for the same reasons that it satisfies New York's long-arm statute."); *Licci II*, 732 F.3d at 170 ("We pause to note that, despite the fact that section 302(a)(1) of New York's long-arm statute and constitutional due process are not coextensive, and that personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare."); *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 168-69 (2d Cir. 2015) (noting the wide overlap between Section 302(a)(1) and the Due Process Clause and combining its application of the two). "That observation does not, however, spare [the Court] from a separate constitutional analysis in each such case." *Licci II*, 732 F.3d at 170; *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) ("New York law has relied significantly on due process cases in developing its jurisprudence under its long-arm statute. We have therefore discussed them here. But we do so only as a means of understanding New York State long-arm jurisdiction."). If a plaintiff's claims arise out of or relate to a defendant's minimum contacts with the forum state, personal jurisdiction is proper over that claim unless the defendant presents "a compelling case that the

14

presence of some other considerations would render jurisdiction unreasonable." *Licci II*, 732

F.3d at 173 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

The Court must apply the foregoing standards to each defendant individually, *Berdeaux*

*v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 397 (S.D.N.Y. 2021), and does so in turn.

### 1.    New York Long-Arm Jurisdiction Over Armour and JK Operations

Begin with Armour and JK Operations—both signatories of the MOU, though Armour in

his official capacity.  (SAC ¶ 22.)  The parties argue extensively about whether the MOU is

sufficient to establish personal jurisdiction over Armour and JK Operations in New York.

Defendants insist that Armour did not sign the MOU in New York, the agreement contains no

provisions indicating a connection to New York, and the only negotiations that took place in

New York occurred during a single conversation "for an unreported period of time without any

particulars, and during a train ride from New York to [Rhode] Island."  (Mem. at 12-13.)

Moreover, Defendants contend that Armour's other connections to New York, such as attending

JK fashion shows and award ceremonies, are "unrelated to the MOU" and thus irrelevant for

present purposes.  (*Id.* at 13 n.3.)

It is true that Narang spends much of her briefing arguing that her signing the MOU in

New York and having a meeting with Armour in New York in advance of their signing any

contract are sufficient contacts to subject defendants to personal jurisdiction in New York.  (*See*

Opp. at 13-17.)  But "courts are 'skeptical of attempts to assert personal jurisdiction over a

defendant based on a single meeting in New York, especially where that meeting did not play a

significant role in establishing or substantially furthering the relationship of the parties.'"

*Shelbourne Glob. Sols., LLC v. Gutnicki LLP*, 658 F. Supp. 3d 104, 116 (E.D.N.Y. 2023)

(quoting *Gordian Grp., LLC v. Syringa Expl. Inc.*, 168 F. Supp. 3d 575, 587 (S.D.N.Y. 2016)).

"When a single meeting in New York is not related to the negotiation of a contract, courts afford

it even less weight." *Gordian*, 168 F. Supp. 3d at 587 (collecting cases, including *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 368 (2d Cir. 1986)).  And though Narang signed the MOU here, plaintiffs typically cannot establish personal jurisdiction through their unilateral decisions about where to execute agreements with out-of-state defendants.  *See, e.g.*, *PaineWebber Inc. v. WHV Inc.*, No. 95-CV-52, 1995 WL 296398, at *3-4 (S.D.N.Y. May 16, 1995) ("When the defendant contracts for services to be performed in New York but does not seek out a New York forum and connections with New York, . . . it may not, without more, be subjected to personal jurisdiction.").  Or, as Judge Engelmayer summarized in a recent case, "the circumstances surrounding the contracts—their creation or performance—could potentially have conferred [specific personal] jurisdiction," such as if "the contracts [had] been negotiated in New York, or [if] the transactions contemplated by the contracts [had] taken place in New York, or [if] the contracts [had] given rise to obligations that were to be performed in New York."  *Beskrone v. Berlin*, 656 F. Supp. 3d 496, 510 (S.D.N.Y. 2023).  Here, Narang's allegations do not raise the plausible inference that anything specific about the MOU was negotiated in New York, and her own execution of the agreement here was hardly a "purposeful" act by Defendants.

But Narang alleges more.  Specifically, she contends that "Narang and LMA were approached by [Junk Kouture] to secure corporate sponsorships for its educational and live entertainment platform and assist with rolling out [Junk Kouture] to 5 new markets: New York, London, Paris, Milan and Abu Dhabi" (SAC ¶ 4), and that "[i]n April 2021, LMA entered into a six-month agreement with [Junk Kouture] to devise marketing strategies and sponsorship proposals targeting prospective partners in New York, London, Paris, Milan and the UAE," under which Junk Kouture "agreed to pay LMA $20,000 per month as a retainer, plus twenty percent [] commissions on all sponsorships sold" (*id.* ¶ 9).  And Narang alleges that all of those

agreements were made with Armour.  (*See, e.g.*, *id.* ¶¶ 8, 19.)  More than recruiting an

independent agent to pursue sponsorships on its behalf, Junk Kouture, through Armour, initiated

its relationship with Narang with the explicit purpose of pursuing sponsorships in New York,

like the one at issue in this case.  And in her declaration, Narang further alleges that she, Armour,

and a Deloitte employee met in New York to pitch a sponsorship of Junk Kouture to Deloitte,

and that "[m]ost of [Narang's] work to perform [the MOU] to secure the Deloitte sponsorship

occurred in New York City."  (ECF No. 61-1 ("Narang Dec.") ¶¶ 18, 20.)  The Court may

consider such an affidavit to determining the propriety of personal jurisdiction.  *MTS Logistics,*

*Inc. v. Innovative Commodities Grp., LLC*, 442 F. Supp. 3d 738, 742 n.1 (S.D.N.Y. 2020) ("On a

motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look

beyond the four corners of the complaint and consider materials outside of the pleadings,

including accompanying affidavits, declarations, and other written materials.").  The MOU was

thus the culmination of a campaign to expand Junk Kouture's operations in New York, using a

New York-based marketer, recruited to secure the sponsorship of a company with substantial

operations in New York.  Thus, the MOU—and Narang's claims arising from it—stem directly

from Armour's and JK Operations' (as a signatory of the MOU) purposeful direction of services

to New York.  That is sufficient to establish personal jurisdiction under Section 302(a)(1).

　　　　As to Armour, Defendants suggest that he is not subject to this Court's personal

jurisdiction because he merely "signed the MOU on behalf of JK Operations."  (Mem. at 13.)

"This argument is not persuasive, because New York has abandoned the fiduciary shield

doctrine, and courts may obtain jurisdiction over a corporate officer or employee based upon his

contacts in New York, even if his activities were performed solely in a corporate capacity."

*Matchroom Boxing Ltd. v. Paul*, No. 22-CV-8178, 2024 WL 4363700, at *8 (S.D.N.Y. Sept. 30,

2024) (cleaned up).  As Armour's activities in New York may be attributed to him for

jurisdictional purposes even though he may have taken those actions on behalf of JK Operations,

this argument poses no further barrier.  Accordingly, Section 302(a)(1) permits New York courts

to exercise personal jurisdiction over Armour and JK Operations for claims arising from the

MOU.

### 2.    New York Long-Arm Jurisdiction Over Nonsignatory Defendants

Turn now to the remaining defendants—JK Entertainment, JK Limited, and JK

Production—not formally signatories of the MOU.  (*See* SAC ¶ 22.)  Narang does not present

any basis on which to distinguish the various JK entities in this case, despite Defendants'

contention that there is an even less colorable basis for exercising personal jurisdiction over JK

Entertainment, JK Limited, and JK Production.  (*See* Opp. at 13-16; Mem. at 12.)  And though

Narang does argue elsewhere in her opposition that those entities are the alter egos of Armour,

she does not make any argument regarding the implications of that for personal jurisdiction

purposes.  Moreover, Defendants do not in their reply make arguments against an application of

Narang's alter ego allegations to personal jurisdiction (likely because Narang did not put forward

any such application), instead noting that "Plaintiff has, in effect, conceded that this Court should

dismiss her claims against" the nonsignatory defendants for lack of personal jurisdiction.  (Reply

at 8.)  Because Narang's "complaint is riddled with instances of improper group pleading,"

*Berdeaux*, 561 F. Supp. 3d at 397, and because she makes no argument for exercising personal

jurisdiction over the nonsignatory defendants in particular, the motion to dismiss with respect to

JK Entertainment, JK Limited, and JK Production is granted.[4]

---

[4] Even if the Court were to overlook Narang's failure to present a specific argument for personal jurisdiction as to the nonsignatory defendants in her brief, the result would be the same. In her declaration, Narang states the following regarding the JK entities:  "[T]here was no daylight between Troy and his various companies; he is the alter ego, owner of all of them.

### 3. Due Process Limitations on Personal Jurisdiction Over Armour and JK Operations

That leaves the Due Process Clause.  As the Second Circuit has intimated, it is the rare case where an exercise of personal jurisdiction, permissible under Section 302(a)(1), is nevertheless unconstitutional.  *See, e.g.*, *Licci II*, 732 F.3d at 170.  Perhaps unsurprisingly, then, Defendants do not argue that this Court's exercise of personal jurisdiction over them would offend due process.  (*See* Mem. at 11-14; Reply at 8-11.)  A defendant may waive an objection to a court's exercise of personal jurisdiction.  *See Pellegrino v. Proctor & Gamble Co.*, No. 23-CV-10631, 2025 WL 240762, at *4 (S.D.N.Y. Jan. 17, 2025) (citing *Burger King*, 471 U.S. at 472 n.14); *see also* Fed. R. Civ. P. 12(h) (deeming a failure to include, in a Rule 12 motion or answer, the defense of lack of personal jurisdiction as a waiver of that defense).  Because Defendants make no due process arguments in moving to dismiss for lack of personal jurisdiction, they have waived any constitutional objection.  *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-705 (1982).

Because N.Y. C.P.L.R. § 302(a)(1) permits the Court's exercise of personal jurisdiction over Armour and JK Operations in this action, and Defendants have made no (likely unsuccessful) argument that such an exercise would be unconstitutional, the motion to dismiss pursuant to Rule 12(b)(2) is denied as to those defendants.  The motion is granted with respect to Defendants JK Entertainment, JK Limited, and JK Production.

---

From our conversations, it became clear to me that he was rather flippant with his accounts and records, taking money from one entity and passing it on to another.  He often complained that he was out of funds."  (ECF No. 25 ¶ 17.)  Such a factual showing, while permissible on a Rule 12(b)(2) motion, remains conclusory and insufficient to establish personal jurisdiction over the nonsignatory defendants, particularly given Armor's declaration describing the nature and status of each of those entities.  (ECF No. 17 ¶¶ 4-7.)

C.    **Election of Remedies Defense**

Past those jurisdictional issues, Defendants move to "dismiss Plaintiff's supplemental claim because Plaintiff elected to terminate the MOU by filing this action." (Mem. at 14 (capitalization altered).)  Specifically, Defendants characterize the operative complaint as "assert[ing] a new claim for breach of contract based on conduct that allegedly occurred eight months after this litigation began." (*Id.*)  Defendants' position is puzzling, however, because the operative complaint adds no new claims. (*Compare* SAC ¶¶ 48-49 *with* AC ¶¶ 41-42.)  Instead, it adds new allegations that increase Narang's computation of her damages, as she alleges that Defendants failed to pay her commission on the Deloitte sponsorship obtained in 2024. (*See* SAC ¶¶ 42-47.)  That is not barred by the election of remedies doctrine, which, as already explained, is an affirmative defense under New York law that generally "bars the pursuit of alternative relief after a party has 'chosen one of two or more co-existing inconsistent remedies, and in reliance upon that election, . . . gained an advantage, or the opposing party . . . suffered some detriment.'" *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 238 (S.D.N.Y. 2006) (quoting *331 E. 14th St. LLC v. 331 E. Corp.*, 740 N.Y.S.2d 327, 328 (1st Dep't 2002)). Because Narang alleges that her expectation under the MOU included future commissions like the one she would purportedly receive from the 2024 sponsorship deal, increasing the total of her damages to include that commission is not a remedy inconsistent with her original election to sue Defendants for breach of contract.  Rather than "treating the MOU as simultaneously broken and subsisting" (Mem. at 15), Narang alleges merely that that agreement "runs from May 1, 2023, to April 30, 2026" and entitles Narang to "commission on fees received by JK for sponsorships secured by Narang" (SAC ¶ 24; *see also id.* ¶ 36 ("[O]ne year's commission plus the balance owed under the MOU if Deloitte continued its sponsorship had a total value of at least $225,000.")).  Of course, if Narang did not actually secure the 2024 sponsorship deal prior to

initiating this action, then the election of remedies doctrine or some other contract law principle

may, at a later stage of this litigation, limit her recovery.  But because the operative complaint

merely supplemented Narang's original allegations regarding her damages from Defendants'

original alleged breach, the affirmative defense presents no reason to dismiss Narang's claims.

> ### D.    Nonsignatory Defendants' Breach of Contract Liability

Defendants also move to dismiss the breach of contract claim against the nonsignatory

defendants, arguing that Narang's allegations of alter ego status are conclusory.  (Mem. at 20-

22.)  The only remaining defendants are Armour and JK Operations, *see supra* § III.B, the latter

of which is a signatory of the MOU.  That leaves only whether Narang has stated a claim for

breach of contract against Armour, who no one disputes signed the MOU only on behalf of JK

Operations.

"Generally, a nonsignatory to a contract cannot be named as a defendant in a breach of

contract action unless it has thereafter assumed or been assigned the contract." *Northwell*

*Health, Inc. v. BlueCross BlueShield of Tenn., Inc.*, No. 23-CV-600, 2024 WL 5108159, at *2

(E.D.N.Y. Dec. 13, 2024) (quotation marks omitted).  The same holds for individuals who sign

contracts in their capacity as agents for corporations, unless those contracts adduce "clear and

explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to,

that of his principal." *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5

(2d Cir. 1991) (quoting *Mencher v. Weiss*, 306 N.Y. 1, 4 (1953)).  However, "[u]nder New York

law, a court may pierce the corporate veil where 1) 'the owner exercised complete domination

over the corporation with respect to the transaction at issue,' and 2) 'such domination was used

to commit a fraud or wrong that injured the party seeking to pierce the veil.'" *MAG Portfolio*

*Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Am. Fuel*

*Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997)).  "Thus, to proceed on an alter

ego theory, a plaintiff must allege facts sufficient to show that the corporations actually

functioned as a single entity and should be treated as such."  *Soroof Trading Dev. Co. v. GE

Microgen, Inc.*, 283 F.R.D. 142, 148 (S.D.N.Y. 2012) (quotation marks omitted).  "To determine

whether different corporate entities actually functioned as one, courts look to factors including

disregarding corporate formalities, siphoning or intermingling of funds, inadequate

capitalization, or that the subsidiary is a mere sham acting for the parent, among others."  *Id.* at

148-49 (cleaned up).

Though Narang supplies declarations purporting to further elaborate her alter ego

allegations, unlike for determining whether the Court may exercise personal jurisdiction, testing

the legal sufficiency of the breach of contract claim permits no consideration of declarations

outside of the complaint.  See *Kumpf v. N.Y. State United Tchrs.*, 642 F. Supp. 3d 294, 302-03

(N.D.N.Y. 2022) (explaining that a district court may consider declarations in considering a Rule

12(b)(1) motion to dismiss for lack of subject matter jurisdiction, but not in considering a Rule

12(b)(6) motion to dismiss for failure to state a claim unless the declaration is attached to the

complaint as an exhibit or incorporated by reference).  The Narang and Reice Declarations were

not attached to or incorporated by the operative complaint; instead, they were filed in support of

Narang's opposition to the motion to dismiss.  (*See* ECF Nos. 49, 61.)  Narang's citations to

those declarations are thus unhelpful in determining whether her allegation of alter ego status is

sufficient to state a breach of contract claim against the nonsignatory Defendants.

Narang's allegations of alter ego status in the operative complaint, alone, are insufficient

to proceed past a motion to dismiss.  Narang alleges, of course, that Armour and the entity

defendants commingled funds and failed to maintain adequate books and records.  (SAC ¶ 41.)

But that is textbook conclusory, containing no "specific averment of facts" to render the legal

conclusion plausible enough to proceed past the motion to dismiss. *Cf. S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). And it goes against the consensus of courts in this Circuit that have looked skeptically at "information and belief" pleading, *cf. Long Side Ventures LLC v. Hempacco Co., Inc.*, No. 22-CV-8152, 2023 WL 6386888, at *7 (S.D.N.Y. Sept. 29, 2023), especially as it concerns allegations of alter ego status, *see, e.g.*, *Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 572 (S.D.N.Y. 2022) (refusing to exercise personal jurisdiction based on an allegation that "merely recite[d] the legal standard for piercing the corporate veil"); *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 15 (2d Cir. 2014) ("[G]eneralized and conclusory allegations regarding common ownership, employees, management, control, and decisionmaking . . . are essentially a recitation of the legal standard and are plainly insufficient to state a claim of alter ego status."). True, Narang alleges also that "Defendants redirected the funds [from the 2024 sponsorship payment] due Narang per the MOU to either Armour for his personal use or to third parties with the intent to deprive her of same." (SAC ¶ 40.) That allegation is at least fact-laden, as it concerns Defendants' treatment of a particular source of funds. But in positing that Defendants redirected the funds to *either* Armour or third parties, all Narang actually alleges is that the funds went to an entity other than her. That allegation also does not differentiate among the various entity defendants, making it impossible for the Court to determine whether JK Operations (a signatory defendant) is the entity that moved the money—which would not bear on the alter ego status of any other defendant—or whether some nonsignatory entity did.

Narang's cited cases are inapposite. In *Rothstein v. Mahne*, Judge Caproni denied a motion to dismiss based in part on failure to sufficiently allege alter ego status. No. 15-CV-3236, 2015 WL 6828061, at *5-6 (S.D.N.Y. 2015) (citing *Arista Recs., LLC v. Doe 3*, 604 F.3d

110, 120 (2d Cir. 2010)).  But before doing so, Judge Caproni clarified:  "Allegations, when based upon information or belief, must be accompanied by a statement of the facts upon which the belief is founded."  *Id.* at *5 (quotation marks omitted).  In *Rothstein*, those facts were extensive compared to those presented in this case:  The plaintiff pleaded that one of the defendant entities had "no employees, no operations, no office, and no board of directors, officers, or decision makers other than [the individual defendant]," that the individual defendant "withdr[ew] and appropriate[d] [the entity defendant's] assets and money for his own personal use and benefit," that "payments made [to the entity defendant] were personally accepted by [the individual defendant]," and that the individual defendant "transferred money out of [the entity defendant] to Panama, where [the individual defendant] maintain[ed] a personal residence and other assets."  *Id.* at *6.  Narang alleges nothing of the sort here.

In Narang's second case, *O'Connor v. 11 West 30th St. Restaurant Corp.*, Judge McKenna rejected a similar motion to dismiss, holding that the plaintiff had adequately alleged alter ego status.  No. 94-CV-2951, 1995 WL 354904, at *4 (S.D.N.Y. June 13, 1995).  But there, again, the plaintiff pleaded "facts in support of this allegation on information and belief," including that the corporation was "inadequately capitalized," "[did] not pay dividends," "[did] not maintain books and records separate from [the individual defendant]," "commingle[d] funds with [the individual defendant] and his other corporate and non-corporate business enterprises," and was, around the time the action was commenced, stripped "of any assets it then held in order to make the corporation insolvent and unable to pay any monetary damages that might be assessed against it."  *Id.* at *2 n.2.  Those allegations (found sufficient before the *Twombly* and *Iqbal* standard) far exceed those included in the operative complaint.

24

Because Narang has failed to allege anything beyond a bare recitation of two legal theories of alter ego liability, she may not assert claims for breach of contract against Armour on that basis.

Finally, Narang gestures in her opposition at an alternative theory to bind the nonsignatory defendants (again, at this point, just Armour): the rule in New York that "a non-signatory to a contract can be liable for a contract 'by manifesting an intent to be bound without being an alter ego of a signatory to the contract.'" (Opp. at 23-24 (quoting *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 285 (S.D.N.Y. Mar. 31, 2023)).) But as Defendants rightly point out, Narang "references, and then wholly abandons," this argument, failing to supply any reason why the intent-to-be-bound requirement is satisfied here. (*See* Reply at 11 n.4.)

Accordingly, the motion to dismiss the breach of contract action against Armour is granted.[5]

### E.    Quantum Meruit Claim

Finally, Defendants argue in passing that Narang's claim for quantum meruit is barred because the dispute between the parties is governed by a valid contract. (*See* Mem. at 22.) It is true that "New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citing *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388 (1987)). But Narang pleads this claim "in the alternative." (SAC ¶ 49.) "Federal Rule of Civil

---

[5] Defendants do not move to dismiss the quantum meruit claim on the same basis. (*See* Mem. at 20-22.) Accordingly, the Court does not consider whether the operative claim states a claim for quantum meruit against Armour in particular.

Procedure 8 expressly authorizes pleadings in the alternative," and "[f]or this reason, courts regularly allow plaintiffs to maintain unjust enrichment and quantum meruit claims as pleadings in the alternative at the motion to dismiss stage where the validity and scope of the contract is difficult to determine, where the parties dispute the existence of a contract, or where the claims arise out of agreements or understandings of the parties that were not expressly written in the contract." *Keybanc Cap. Mkts., Inc. v. Extreme Steel, Inc.*, 710 F. Supp. 3d 239, 247 (S.D.N.Y. 2024). Here, even though there are not enforceability challenges yet in the record, "Defendants may well raise . . . challenges to the agreement's enforceability as the case progresses." *Id.* And in that vein, the operative complaint contains allegations suggesting that, at times, Defendants suggested that the MOU may not give rise to an obligation to pay Narang, offering her smaller amounts "in full and final settlement" of "her *claim* for payment" and accusing her of "misrepresentation" of the total value of the Deloitte sponsorship. (SAC ¶¶ 34-35.) Those allegations, too, create the possibility that the enforceability of the contract may be called into question in this litigation. It is thus too early to dismiss Narang's alternative claim, especially in light of Rule 8's explicit allowance for alternative pleading. Accordingly, the motion to dismiss the quantum meruit claim is denied.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is (1) GRANTED at to all claims asserted against JK Entertainment, JK Limited, and JK Production; (2) GRANTED as to the breach of contract claim asserted against Armour; and (3) DENIED in all other respects.

Defendants Armour and JK Operations are directed to file an answer to the remaining claims within fourteen days of the date of this Opinion and Order.

The Clerk is directed to close the motion at ECF No. 59.

SO ORDERED.

Dated: June 3, 2025
New York, New York

_____
J. PAUL OETKEN
United States District Judge